# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | |
| Bowles Sub Parcel A, LLC | BKY No. 12-42765 |
| Fenton Sub Parcel A, LLC | BKY No. 12-42768 |
| Bowles Sub Parcel B, LLC | BKY No. 12-42769 |
| Fenton Sub Parcel B, LLC | BKY No. 12-42770 |
| Bowles Sub Parcel C, LLC | BKY No. 12-42772 |
| Fenton Sub Parcel C, LLC | BKY No. 12-42774 |
| Debtors. | |

| | |
|---|---|
| BOWLES SUB PARCEL A, LLC; | Civil No. 13-1013 (JRT) |
| FENTON SUB PARCEL A, LLC; | Civil No. 13-1017 (JRT) |
| BOWLES SUB PARCEL B, LLC; | Civil No. 13-1020 (JRT) |
| FENTON SUB PARCEL B, LLC; | Civil No. 13-1021 (JRT) |
| BOWLES SUB PARCEL C, LLC; | Civil No. 13-1022 (JRT) |
| FENTON SUB PARCEL C, LLC, | Civil No. 13-1023 (JRT) |
| Appellants, | |
| v. | |
| CW CAPITAL ASSET MANAGEMENT LLC *as special servicer for Wells Fargo Bank, N.A., the trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corporation Commercial Mortgage Pass-Through Certificates Series 2004-LN2,* | **MEMORANDUM OPINION AND ORDER AFFIRMING THE BANKRUPTCY COURT ORDERS** |
| Appellee. | |

Ralph V. Mitchell, Jr., **LAPP LIBRA THOMSON STOEBNER & PUSCH, CHARTERED**, 120 South Sixth Street, Suite 2500, Minneapolis, MN  55402, for Appellants.

Frederick W. H. Carter, **VENABLE, LLP**, 750 East Pratt Street, Suite 900, Baltimore, MD   21202; and Michael A. Rosow, **WINTHROP & WEINSTINE, PA**, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402, for Appellee.

This matter is before the Court on appeal from the March 4, 2013, order of United States Bankruptcy Judge Kathleen H. Sanberg.[1] Appellants are six entities that own real estate: Bowles Sub Parcel A, LLC; Bowles Sub Parcel B, LLC; Bowles Sub Parcel C, LLC; Fenton Sub Parcel A, LLC; Fenton Sub Parcel B, LLC; and Fenton Sub Parcel C, LLC (collectively "Bowles," "Debtors," or "Appellants"). Appellee is CW Capital Asset Management, LLC, as special servicer for Wells Fargo Bank, N.A., the trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corporation, Commercial Mortgage Pass-Through Certificates, Series 2004-LN2 ("the Trust," "Creditor," or "Appellee"). Bowles is indebted to the Trust pursuant to a loan agreement that includes a default interest clause, which provides for an increased rate of interest in the event of default. In 2011, Bowles defaulted on the loan and thereafter filed for Chapter 11 bankruptcy protection. The order from which Bowles appeals upheld the default interest clause, thereby allowing the Trust's claim for approximately $1.5 million in pre-petition default interest. Bowles appeals, arguing that default interest clause is an

---

[1] The Bankruptcy Court issued three separate orders – one for each pool of property. Each of the three orders applies to two Appellants and therefore appears on two separate dockets. (*See* Civ. No. 13-1013, Supplemental Bankr. Transmittal, Attach. 2 ("Order A"), Docket No. 14 and Civ. No. 13-1017, Bankr. Transmittal, Attach. 25 ("Order A"), Docket No. 5; Civ. No. 13-1020, Supplemental Bankr. Transmittal, Attach. 1 ("Order B"), Docket No. 13 and Civ. No. 13-1021, Bankr. Transmittal, Attach. 26 ("Order B"), Docket No. 5; Civ. No. 13-1022, Bankr. Transmittal, Attach. 25 ("Order C"), Docket No. 5 and Civ. No. 13-1023, Bankr. Transmittal, Attach. 25 ("Order C"), Docket No. 5.) Because there is no need to distinguish among the Bankruptcy Court's orders for purposes of this appeal, the Court will refer to the orders in the singular, cite to the orders as "Mem. & Op." and affirm all of the orders in this single memorandum opinion and order.

unenforceable penalty under Minnesota law.  Because the Court finds that Bowles failed to rebut the presumptive validity of the default interest provision, the Bankruptcy Court's factual findings are adequately supported, and the Bankruptcy Court's ultimate conclusion is consistent with Minnesota law, the Court will affirm the order of the Bankruptcy Court.

## BACKGROUND

Debtors collectively own three "pools" of real property in Dakota and Hennepin Counties.  (Civ. No. 13-1013, Bankr. Transmittal, Ex. 15 ("Stipulated Facts") ¶ 2, Apr. 30, 2013, Docket No. 6.)  Debtors are indebted to the Trust under three separate promissory notes ("the Note") secured by interests in the pools of real property pursuant to mortgages (collectively, "the Loan Documents").  (*Id.* ¶ 3.)  The original principal amount of the loans totaled $37,396,000.  (*Id.*)  The Note includes a default interest provision providing that upon default the interest rate on the remaining principal will be 5.0% plus the non-default rate of 5.04%.  (Bankr. Transmittal, Ex. 1 ("Proof of Claim") at 10, 14.)  The Note states that the borrower "acknowledges that it would be extremely difficult or impracticable to determine [the Trust]'s actual damages resulting from any late payment or default, and such late charges and default interest are reasonable estimates of those damages and do not constitute a penalty."  (*Id.* at 14.)  The Note also states that "if such increased rate of interest may not be collected under applicable law," then the default interest will be the maximum rate allowed under applicable law.  (*Id.*)

Bowles defaulted under the terms of the Loan Documents on May 31, 2011, when Steven B. Hoyt, guarantor of the loan and chief manager of Bowles, filed for personal Chapter 11 protection. (Stipulated Facts ¶ 5; Bankr. Tr. at 52:1-2, Apr. 30, 2013, Docket No. 7.) Bowles also defaulted under the terms of the Loan Documents by failing to make payments due under the Note beginning in April 2012. (Stipulated Facts ¶ 5.) The Trust gave notice of acceleration by letter dated January 19, 2012. (*Id.*)

Each of the Debtors filed for Chapter 11 protection on or about May 8, 2012, and filed a joint Chapter 11 reorganization plan on August 1, 2012. (Stipulated Facts ¶¶ 1, 8.) The Debtors are solvent and under their proposed plans, unsecured creditors will receive the full amount of their claims. (*Id.* ¶ 9.) The Trust timely filed Proofs of Claim on August 17, 2012. (*Id.* ¶ 6.) The Proofs of Claim listed pre-petition default interest for the period from May 31, 2011, to May 7, 2012, totaling $1,516,739.80. (*Id.*) Bowles timely objected to the Proofs of Claim and the parties were unable to come to a resolution regarding the inclusion of the default interest.[2]

The Bankruptcy Court held a hearing on February 12, 2013. (Bankr. Tr. at 1.) Debtors' chief manager (Hoyt) and Rakesh Patel, a CW Capital vice-president, offered the only testimony at the hearing. (Bankr. Tr. at 4.) Other evidence included the Loan Documents, the Pooling and Servicing Agreement, and related documents. (*See* Bankr. Transmittal, Attach. 18.)

---

[2] The parties also disputed whether claims for prepayment premium were permitted and the Bankruptcy Court concluded that they were not. (Mem. & Op. at 1.) The Trust does not appeal this portion of the Bankruptcy Court's decision.

The Trust offered evidence regarding the types of damages that the default interest would compensate. First, Patel testified that default interest compensated the Trust for "the additional risk profile that the loan takes on when it's defaulted." (Bankr. Tr. at 112:5-7.) Second, Patel testified that default interest compensated the Trust for costs incurred by the special servicer as a result of the default, including salary expenses and overhead. (*Id.* at 102:19-24.) Patel also discussed advances of principal and interest that the Trust or the master servicer of the loan made to bondholders while the Loan was in default. (*Id.* at 113:4-114:8.) The amounts advanced totaled $1,798,377.85. (*Id.* at 152-53.) The parties dispute the extent to which Bowles' Chapter 11 reorganization plan requires Bowles to reimburse the Trust for the advanced principal and the interest on those advances. (*See, e.g.*, *id.* at 163:10-11.)

Patel testified as to the predictability of the damages resulting from default. He stated that "there is no way to know what the damage is [or] what the defaults would have been at the time" that the Note was drafted, (*id.* at 99:5-7), and that the damages resulting from the additional risk of a defaulted loan are "a little bit harder to put a number behind," (*id.* at 112:9-10).

Patel was unable to provide the exact amount of the Trust's actual damages at the hearing because he "didn't know that [he] would be asked to give those numbers." (*Id.* at 111:21-22.) Patel did testify, however, that a default interest rate of four to five percent was typical in his experience with similar types of loans. (*Id.* at 142:6-22.) Patel also testified that the interest rate going forward under the Chapter 11 reorganization plans is lower than the Note rate. (*Id.* at 170:5-13.) Patel concluded that under the proposed

Chapter 11 reorganization plan, the default interest will not be sufficient to cover the costs incurred by the Trust and, as a result, the Trust will not be made whole even if its claim for default interest is allowed. (*Id.* at 170:9-13.)

Bowles offered evidence of various types of damages for which compensation is provided by portions of the Loan Documents other than the default interest provision. Hoyt testified that Bowles is required to compensate the Trust for specific costs associated with default (including attorneys' fees, late fees, and costs of administration and enforcement) in addition to the default interest. (*Id.* at 84:16-24.) He suggested that enforcing the default interest provision in these circumstances would result in "double debt paying, if not triple debt paying." (*Id.* at 85:3-4.) Patel, on the other hand, testified that the default interest was not duplicative of a yield maintenance premium that was due upon default, late fees, or processing charges. (*Id.* at 136-38.)

In an order dated March 4, 2013, the Bankruptcy Court concluded that the default interest provision was enforceable and allowed the Trust's claim for default interest. (Mem. & Op. at 10-12.) Bowles appealed the order, (Notice of Appeal, Apr. 30, 2013, Docket No. 1), and elected to have the District Court hear the appeal pursuant to 28 U.S.C. § 158(c)(1)(A), (Notice of Appeal, Attach. 3).

## ANALYSIS

I.   **STANDARD OF REVIEW**

In bankruptcy proceedings, the Court sits as an appellate court and reviews the Bankruptcy Court's conclusions of law *de novo*. *See In re Reynolds*, 425 F.3d 526, 531

(8th Cir. 2005).  The district court reviews findings of fact for clear error.  *Id*.; *see also* Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . .").  "A finding is clearly erroneous when although there is evidence to support it[,] the reviewing court is left with the definite and firm conviction that a mistake has been committed."  *DeBold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006) (internal quotation marks omitted).  The Bankruptcy Court determines the credibility of witnesses and the weight to be accorded testimony.  *See* Fed. R. Bankr. P. 8013 ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."); *cf. Imperial Cas. & Indem. Co. v. Carolina Cas. Ins. Co.*, 402 F.2d 41, 44 (8th Cir. 1968).  On appeal, the Court views the evidence in the light most favorable to the party that prevailed before the Bankruptcy Court and gives that party the benefit of all reasonable inferences that may be drawn from the evidence.  *See Imperial Cas. & Indem. Co.*, 402 F.2d at 44.

**II.    BOWLES' APPEAL**

Whether the Trust is entitled to recover default interest as part of its claim in Bowles' Chapter 11 proceedings depends on whether the default interest provision is enforceable under Minnesota law.  *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."); *see also* 11 U.S.C. § 502(b)(1).

Under Minnesota law, in determining whether a contractual provision is enforceable as liquidated damages,[3] as opposed to an unenforceable penalty, "[t]he controlling factor . . . is whether the amount agreed upon is reasonable or unreasonable in the light of the contract as a whole, the nature of the damages contemplated, and the surrounding circumstances." *Gorco Constr. Co. v. Stein*, 99 N.W.2d 69, 74 (Minn. 1959). As the Minnesota Supreme Court explains:

> [I]n determining the reasonableness of the amount [of liquidated damages], the court will take into consideration the relation of the parties, their situation, the absence or presence of fraud or oppression, and the purpose the agreement seeks to subserve. It is not necessary to inquire whether it is wise or considerate, but whether it is in conflict with the principles and practices that govern transactions of a like nature.

*Meuwissen v. H.E. Westerman Lumber Co.*, 16 N.W.2d 546, 550-51 (Minn. 1944) (internal quotation marks omitted). While the circumstances of the agreement described above are relevant, Minnesota law also requires liquidated damages clauses to satisfy two conditions in order to be enforceable: "'(a) the amount so fixed [must be] a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach [must be] one that is incapable or very difficult of accurate estimation.'" *Gorco*, 99 N.W.2d at 74-75 (quoting Restatement (First) of Contracts § 339

---

[3] Default interest clauses are distinguishable from liquidated damages clauses because the latter provide for a fixed amount of damages in the event of a breach, *see In re Qwest's Wholesale Serv. Quality Standards*, 702 N.W.2d 246, 262 (Minn. 2005), whereas default interest clauses cause the interest rate on whatever indebtedness remains at the time of default to escalate to a higher percentage, *see In re Direct Transit, Inc.*, 226 B.R. 198, 201 (B.A.P. 8th Cir. 1998). In other words, the monetary consequences of a default interest clause differ depending on when the default occurs, while the same is not true of a typical liquidated damages clause. Despite this slight difference, the Bankruptcy Court applied a liquidated damages analysis to the default interest provision and the parties do not contest that this is the appropriate analysis.

(1932)). If these conditions are met, "a contract provision for liquidated damages can be enforced without proving actual damages." *Willgohs v. Buerman*, 115 N.W.2d 59, 62 (Minn. 1962). It follows that a liquidated damages provision is not necessarily unenforceable simply because the actual damages a party happened to suffer are smaller than the amount specified in the contract, or even non-existent. The question is whether the amount fixed was a reasonable forecast at the time the parties entered the agreement.

Additionally, Minnesota courts "look with candor, if not with favor, upon a contract provision for liquidated damages when entered into deliberately between parties who have equality of opportunity for understanding and insisting upon their rights." *Gorco*, 99 N.W.2d at 74. Therefore, under Minnesota law, liquidated damages provisions are presumed valid, *see id.*, and a party seeking to invalidate a liquidated damages provision must rebut the provision's presumptive validity by showing that the amount fixed was unreasonable under the circumstances or that actual damages were readily ascertainable, *see, e.g.*, *606 Vandalia P'ship v. JLT Mobil Bldg. Ltd. P'ship*, No. C3-99-1723, 2000 WL 462988, at *5 (Minn. Ct. App. Apr. 25, 2000); *Schindler Elevator Corp. v. Stuart Corp.*, No. C1-94-308, 1994 WL 396348, at *3 (Minn. Ct. App. Aug. 2, 1994).[4]

---

[4] Bowles' suggests that the Trust may have the burden of proving that the default interest provision is enforceable, relying on a Minnesota Court of Appeals opinion which stated that "[a] party may establish a claim for liquidated damages only when it proves three essential elements." *St. Jude Med., Inc. v. Medtronic, Inc.*, 536 N.W.2d 24, 28 (Minn. Ct. App. 1995). However, the Court is bound by clear precedent providing that liquidated damages provisions are presumptively valid. *See Gorco*, 99 N.W.2d at 74. The burden of proof rests on the party opposing the liquidated damages to rebut the provision's presumptive validity by showing that actual damages are readily ascertainable or that the amount of liquidated damages is unreasonable under the circumstances. *See Gorco*, 99 N.W.2d at 74-75; *see also E.D.S. Constr.*

(Footnote continued on next page.)

### A.     Liquidated Damages Analysis vs. Standard Contract Analysis

As an initial matter, Bowles argues that the Bankruptcy Court failed to scrutinize the default interest clause to the extent required by Minnesota law.  Bowles contends that rather than independently determining whether the *Gorco* requirements were satisfied, the Bankruptcy Court found that the default interest clause was enforceable simply because the contract stated that the requirements were satisfied.  Bowles points to the following language from the order:

> [T]he Note provides that the default interest rate charges are a "reasonable" estimate of the damages likely to be incurred by the Trust in the event of default. . . .  [T]he Note expressly states that the damages resulting from default are "difficult and impracticable" to calculate, which Mr. Patel confirmed with his testimony.  The Debtors agreed to these terms by signing the documents.

(Mem. & Op. at 11.)  The Court finds, however, that the Bankruptcy Court applied the appropriate analysis and did not rely exclusively upon the existence of the parties' agreement stating that requirements of enforceability were met.  (*See* Mem. & Op. at 10-12.)  While the Bankruptcy Court did make note of the parties' contractual agreement that the *Gorco* factors were satisfied, it also considered and relied upon evidence from the hearing, including Patel's testimony suggesting that the default interest rate was not unreasonable or disproportionate to actual damages and that the actual damages would

_____
(Footnote continued.)

*Co. v. N. End Health Ctr., Inc.*, 412 N.W.2d 783, 786 (Minn. Ct. App. 1987).  Further, the United States Supreme Court has held that the burden of proof governing a claim within a bankruptcy proceeding is the same as it would be under state law, absent a federal statute providing otherwise.  *See Raleigh*, 530 U.S. at 20-22, 26.  Therefore, the Bankruptcy Court correctly placed the burden on Bowles to establish that the default interest provision was invalid.

have been difficult to calculate.[5]  The Court concludes that the Bankruptcy Court properly scrutinized the default interest provision and determined that the *Gorco* requirements were satisfied.

### B. Factual Findings

Bowles' next argues that the Bankruptcy Court's findings of fact were clearly erroneous. Bowles claims that the Bankruptcy Court clearly erred in finding (1) that Patel testified that actual damages were difficult or impracticable to calculate; and (2) that Patel testified that the default interest was a reasonable forecast of the Trust's damages. The Court notes that the Bankruptcy Court's ultimate conclusion that the default interest clause was enforceable did not require the Bankruptcy Court to affirmatively find that the *Gorco* requirements were satisfied. Rather, the provision was presumptively valid and the burden was on Bowles to show either that damages were readily ascertainable or that the default interest was not a reasonable forecast for damages. Accordingly, even if there was insufficient evidence to support the Bankruptcy Court's two findings of fact here, it would not alter the conclusion that the default interest clause was enforceable because Bowles did not present sufficient evidence to overcome the provision's presumptive validity.

As to the first purportedly erroneous finding, the Bankruptcy Court stated:

---

[5] Bowles also contends that the Bankruptcy Court mischaracterized Patel's testimony. The Court will address this argument in the next section. For present purposes, it suffices to note that the Bankruptcy Court did not rely exclusively on the agreement between the parties.

> At the hearing on this matter, [Patel] testified that actual damages resulting from a default are difficult to quantify in the context of this type of note because the costs vary significantly depending on the length of default and the severity of the financial situations that led to the default.

(Mem. & Op. at 6.) The Bankruptcy Court also explained that "the Note expressly states that the damages resulting from default are 'difficult and impracticable' to calculate, which Mr. Patel confirmed with his testimony." (*Id.* at 11.) Bowles contends, however, that Patel actually testified that there were ways to quantify the Trust's damages, but he was simply not prepared to offer that testimony at trial.

The Court gives substantial deference to the factual findings of the Bankruptcy Court, *see Imperial Cas. & Indem. Co.*, 402 F.2d at 44, and finds that there was sufficient evidence from which the Bankruptcy Court could reasonably infer that actual damages were difficult or impracticable to calculate even if Patel did not use that exact terminology. Patel testified that "there [was] no way to know what the damage is [or] what the defaults would have been at that time." (Bankr. Tr. at 99:1-7.) He also testified that the default interest compensated the Trust for the additional risk profile that the Trust takes on when the loan is in default and that these damages are "a little bit harder to put a number behind."[6] (*Id.* at 112:9-10.) In light of this record, the Court is not "left with the definite and firm conviction that a mistake has been committed" by the Bankruptcy Court

---

[6] The Bankruptcy Court appeared to give this testimony significant weight. The court stated at the hearing that "Mr. Patel testified that . . . there is increased risk when these loans go into default, which has not been quantified" and asked counsel for Bowles whether that risk was "the type of unquantifiable damage, potential damages that is intended to be covered by liquidated damages." (*Id.* at 177:21-178:2.) In response, counsel for Bowles did not refute the Bankruptcy Court's characterization and focused instead on whether the amount of default interest was reasonable. (*Id.* at 178:3-15.)

in stating that Patel testified that the Trust's damages resulting from default were impracticable to calculate. *DeBold*, 452 F.3d at 761 (internal quotation marks omitted).

As to the second disputed finding of fact, the Bankruptcy Court stated, "at the hearing, Mr. Patel provided the only evidence as to whether the default interest was a reasonable forecast for damages incurred in the event of default." (Mem. & Op. at 11.) Bowles contends that Patel did not testify that the default interest was a reasonable forecast for damages incurred in the event of default because the Bankruptcy Court sustained an objection by Bowles' counsel and prevented Patel from directly testifying that the 5.0% default interest was reasonable. (*See* Bankr. Tr. at 142:23-143:11.)

Again, the Court finds that the Bankruptcy Court could reasonably have interpreted Patel as testifying that the default interest was a reasonable forecast for damages. As the Bankruptcy Court noted, Patel testified that the 5.0% default interest rate was typical in his experience with similar loans. Patel further testified as to the various expenses incurred by the Trust as a result of the default that the default interest would cover and testified that the Trust will not be made whole even if the default interest provision is enforced. If the Court accepts Patel's testimony as true, the default interest will not fully compensate the Trust for expenses incurred as a result of the default. The Bankruptcy Court could have reasonably interpreted Patel's testimony to mean that the default interest was not an unreasonably large forecast of the Trust's

damages.[7] Based on the evidence presented below and the deference due to the Bankruptcy Court's factual findings, the Court finds that the Bankruptcy Court did not clearly err in finding that Patel testified that the default interest rate was a reasonable forecast of just compensation for the harm caused by default.

### C. Enforceability of the Default Interest Provision

Although the Court has found that the Bankruptcy Court did not clearly err in its interpretation of Patel's testimony, the Court must address a series of additional arguments Bowles makes in favor of its position that the default interest provision is an unenforceable penalty as a matter of law.

First, Bowles contends that it proved that all types of damage for which default interest could possibly compensate were already covered by other provisions in the Loan Documents. Bowles may be correct that if other provisions of the Loan Documents covered all conceivable types of damage, the default interest provision would be an unenforceable penalty. *See In re AE Hotel Venture*, 321 B.R. 209, 216 (Bankr. N.D. Ill.

---

[7] At oral argument, counsel for the Trust suggested that whether the default interest was a reasonable forecast for damages may be a mixed question of law and fact. Under Minnesota law, reasonableness is generally a question of fact. *See Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990) (holding that the reasonableness of a settlement agreement is "a question of fact . . . to be decided by the court as the factfinder"); *Ford Motor Credit Co. v. Russell*, 519 N.W.2d 460, 465 (Minn. Ct. App. 1994) ("[C]ommercial reasonableness is generally a question of fact . . . ."); *Lindemann v. Comm'r of Pub. Safety*, 404 N.W.2d 909, 912 (Minn. Ct. App. 1987) ("The determination of whether a refusal [to submit to roadside alcohol impairment testing] was reasonable is a question of fact . . . ."). Even if "reasonableness" here was a mixed question of law and fact subject to *de novo* review, however, the Court would still affirm. As the Court explains in the following section, the default interest provision was presumptively valid and Bowles failed to proffer sufficient evidence to compel the Court to conclude that the default interest was an unreasonable forecast for damages.

2005) ("Default interest is not a 'reasonable' charge . . . if it compensates for an injury that has already been compensated in some other way under the parties' agreement."). But Bowles has failed to show that the loan provisions cover all conceivable types of damages resulting from default. To the contrary, no provision of the Loan Documents compensate the Trust for the increased risk of lending to a defaulted borrower, which Patel testified was one of the types of damages covered by the default interest. *See In re Terry Ltd. P'ship*, 27 F.3d 241, 244 (7th Cir. 1994). Patel further testified that the default interest did not duplicate other provisions of the Loan Documents and the Bankruptcy Court may have credited this testimony as well. Because Bowles has not shown that other provisions in the Loan Documents compensate the Trust for all types of damage resulting from default, the Court cannot conclude that the default interest provision is an unenforceable penalty on this basis.[8]

Second, Bowles contends that the increased risk of lending to a party who has defaulted is not a legitimate category of damages to consider in determining the validity of a default interest provision. Bowles relies on an unpublished opinion from the District of Oregon, *Cal. Bank & Trust v. Shilo Inn*, Nos. 3:12-CV-00506, 508, 509, 2012 WL 5605589, at *2-5 (D. Or. Nov. 15, 2012). Yet *Shilo Inn* did not explicitly forbid the consideration of increased risk. Rather, the court simply determined that the creditor in

---

[8] Bowles notes that the default interest is explicitly referred to as a "penalty" in the Pooling and Servicing Agreement. The Court finds that little weight is due to this label. For one, the Note explicitly claims that the default interest "do[es] not constitute a penalty," so the governing documents are inconsistent. Further, the Court's duty is to determine whether the provision satisfies the *Gorco* requirements and this analysis does not hinge on the label assigned to the provision in the contract.

that case had not proved that the default interest rate was reasonably related to the scope of the increased risk.  *See id.* at *5 ("Plaintiff's bald assertions that the default interest provisions are valid because they are intended to compensate Plaintiff for . . . its increased risk of dealing with defaulted borrows [is] unpersuasive.  Generally, every loan that a bank makes to a borrower carries such risks.  Such general assumptions of risk simply do not explain why the five percent increases on Shilo Inn's outstanding loan balances in this instance are reasonable.").

Additionally, other authority supports treating the increased risk of dealing with a defaulted borrower as a valid category of damages for which default interest may compensate.  *See, e.g.*, *In re Kimbrell Realty/Jeth Court, LLC*, 483 B.R. 679, 691-92 (Bankr. C.D. Ill. 2012) (upholding a default interest provision that explicitly provided compensation for the fact that the "risk of nonpayment . . . will be materially increased" following default).  If lenders were unable to utilize default interest provisions to compensate for the increased risk associated with defaulting borrowers, lenders would likely decide to compensate for the potential risk of default by increasing the borrower's non-default interest rate.  *See In re 785 Partners LLC*, 470 B.R. 126, 132 (Bankr. S.D.N.Y. 2012) ("One can only speculate whether the non-Default Rate would have been greater if the parties had not included a separate default rate of interest.").  Furthermore, because increased risk is difficult if not impossible to quantify in advance, utilizing a form of liquidated damages to compensate for this type of damage is particularly appropriate under Minnesota law.  *See In re Nw. Airlines Corp.*, 393 B.R. 352, 357 (Bankr. S.D.N.Y. 2008) ("As the Minnesota courts also recognize, liquidated damages

clauses are most clearly appropriate when actual damages are difficult to calculate in advance, such as damages for lost profits or goodwill." (citing *Meuwissen*, 16 N.W.2d at 550)). Accordingly, the Court concludes that the Bankruptcy Court did not err in relying upon the fact that the default interest was intended to compensate the Trust for increased risks following default.

Third, Bowles contends that the default interest is unenforceable because the Trust was unable to demonstrate what its actual damages were. However, as the Court has repeatedly stressed, Bowles held the burden of demonstrating that actual damages were readily ascertainable. The Trust had no obligation to show actual damages and Bowles cannot shift its burden to the Trust merely by asking Patel what the Trust's actual damages were. Bowles also suggests that the damages incurred are readily quantifiable, but that Patel simply was unprepared to present the numbers at the hearing. Yet, the issue is whether the Trust's damages "were readily ascertainable **at the time the contract was made**." *Schindler Elevator Corp.*, 1994 WL 396348, at *3 (emphasis added). Even if Bowles is correct that Patel could have readily quantified the Trust's actual damages at the present moment, this fact would not be dispositive of whether actual damages were ascertainable at the time the Loan Documents were signed. Further, Patel stressed at the hearing that increased risk of lending to a party that has defaulted were not, and are not, readily quantifiable.

Fourth, Bowles purports to have demonstrated that the Trust's actual damages were vastly smaller than the approximately $1.5 million of pre-petition default interest at issue. However, Bowles made no attempt to quantify the increased risk that the Trust

faces going forward. Further, even if Bowles had shown that the Trust's actual damages were smaller than the amount of default interest it sought, liquidated damages may be enforceable even if a party's actual damages turn out to be smaller than the agreed amount, or even if the party is unable to prove actual damages at all. *See Willgohs*, 115 N.W.2d at 62. While the amount of damages actually suffered may be probative of whether the amount fixed was a reasonable forecast, it is far from dispositive. In light of the conflicting evidence as to the Trust's actual damages, the Court cannot conclude that the 5.0% rate is unreasonable.

Lastly, at oral argument, counsel for Bowles argued that a liquidated damages provision is unenforceable where it provides the same amount of damages whether a breach is trivial or significant. Bowles relied on a comment from the Restatement (First) of Contracts that supports this position. *See* Restatement (First) of Contracts § 339 cmt. b (1932). However, the default interest provision does not, in practice, result in the same amount of damages for all breaches. Because the default interest provision simply increases the rate of interest, an earlier default will result in larger total amounts of default interest than a later default. Additionally, the Court finds that such a strict limitation on the circumstances in which parties are permitted to contractually agree to liquidated damages would be inconsistent with Minnesota law. The Court also notes that the Restatement (Second) of Contracts § 356 (1981) (which replaced Section 339) omits the comment in question.

In sum, the Court concludes that the default interest provision is enforceable. Despite having held the burden of proof below, Bowles repeatedly argues that the Trust

did not present sufficient evidence to establish the enforceability of the provision. (*See, e.g.*, Bankr. Tr. 17:19-22 ("[W]hat we're really going to hear is really an absence of information about what that default interest was supposed to cover.").) Other than Hoyt's testimony that he personally believed the default interest rate results in "at least double debt paying, if not triple debt paying," (Bankr. Tr. at 85:3-4), Bowles proffered almost no affirmative evidence that the default interest fails either of the two *Gorco* requirements, 99 N.W.2d at 74-75. The Bankruptcy Court implicitly acknowledged Bowles' failure to rebut the provision's presumptive validity when it noted "the absence of any other evidence" as to the provision's reasonableness beyond Patel's testimony. (Mem. & Op. at 11.) For the reasons above, the Court finds that the Bankruptcy Court did not err as a matter of fact in its interpretation of Patel's testimony or err as a matter of law in its determination that the two *Gorco* requirements were satisfied.[9] Therefore, the Court will affirm the Bankruptcy Court's order.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the Court **AFFIRMS** the Orders of the Bankruptcy Court dated March 4, 2013 [Civ. No. 13-1013, Docket No. 14, Attach. 2; Civ. No. 13-1017,

---

[9] Beyond the two specific *Gorco* requirements, there is no evidence of fraud or oppression in the creation of the contract, nor is there evidence that the initial parties to the contract were unsophisticated. Patel also testified that the 5.0% default interest rate is consistent with what he has observed in similar loans in the industry. Thus, the surrounding circumstances do not militate toward invalidating the default interest provision as unreasonable. *See Meuwissen*, 16 N.W.2d at 550-51.

Docket No. 5, Attach. 25; Civ. No. 13-1020, Docket No. 13, Attach. 1; Civ. No. 13-1021, Docket No. 5, Attach. 26; Civ. No. 13-1022, Docket No. 5, Attach. 25; Civ. No. 13-1023, Docket No. 5, Attach. 25].

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  December 11, 2013                           ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                                   JOHN R. TUNHEIM
                                                                         United States District Judge